IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

SHELLEY DAWN HOLSTINE,

      Plaintiff,

v.                                       Case No.: 2:20-cv-00359

ANDREW M. SAUL,
Commissioner of the
Social Security Administration,

      Defendant.

PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381-1383f. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings, as articulated in their briefs. (ECF Nos. 11, 12).

For the following reasons, the undersigned **RECOMMENDS** that the Court **GRANT** Plaintiff's motion for judgment on the pleadings to the extent that it requests remand of the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g); **DENY** Defendant's request to affirm the decision of the Commissioner; **REVERSE** the

final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this case, **with prejudice**, and remove it from the docket of the Court.

## I.    Procedural History

On June 6, 2016, Plaintiff Shelley Dawn Holstine ("Claimant") protectively filed for SSI, alleging a disability onset date of January 1, 2009, due to "depression, anxiety, and panic attacks." (Tr. at 244, 250-55, 259). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 132-36, 144-50). Thus, Claimant requested an administrative hearing on her application for benefits, which was held on December 6, 2018, before the Honorable Julianne Hostovich, Administrative Law Judge (the "ALJ"). (Tr. at 69-114). By written decision dated February 7, 2019, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 49-68). The ALJ's decision became the final decision of the Commissioner on March 18, 2020, when the Appeals Council denied Claimant's request for review. (Tr. 1-7).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant filed a Brief by Plaintiff in Support of Appeal, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 11, 12). The time period within which Claimant could file a reply to the Commissioner's brief expired pursuant to L.R. Civ. P. 9.4(a). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 40 years old on her protective filing date and 43 years old on the date of the ALJ's decision. (Tr. at 62). She completed the eleventh grade, communicates in English, and previously worked as a cashier/stocker. (Tr. at 108, 258, 260).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. § 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the

measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 416.920a(d). A rating of "none" or "mild" in the four

4

functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* § 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 416.920a(e)(4).

Here, the ALJ confirmed at the first step of the sequential evaluation that Claimant had not engaged in substantial gainful activity since June 6, 2016, the application date. (Tr. at 54, Finding No. 1). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: generalized anxiety disorder, panic disorder, major depressive disorder, somatic pain disorder, bilateral carpal tunnel syndrome, obesity, degenerative joint disease of the left knee, and radiculopathy of the lumbar region. (*Id.*, Finding No. 2). The ALJ also considered

Claimant's hyperlipidemia, hypertension, hypothyroidism, goiter, and left hip pain, but she found that the impairments were non-severe. (Tr. at 55). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 55-58, Finding No. 3). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work except she can never climb ladders, ropes, or scaffolds. The claimant can frequently balance, stoop, kneel, crouch, and crawl. She can frequently handle, finger and feel with the bilateral upper extremities. The claimant can understand, remember and carryout [sic] simple routine tasks involving only simple work related decisions with the ability to adapt to routine workplace changes. She can have no interaction with the general public. The claimant can have occasional interaction with co-workers and supervisors. She needs a work environment that does not impose strict production quotas.

(Tr. at 58-62, Finding No. 4).

At the fourth step, the ALJ determined that Claimant could not perform her past relevant work. (Tr. at 62, Finding No. 5). Therefore, under the fifth and final inquiry, the ALJ assessed Claimant's age and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 62-64, Finding Nos. 6-9). The ALJ noted that (1) Claimant was born in 1976 and was defined as a younger individual age 18-49 on the date of the application; (2) she had a limited education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because Claimant's past relevant work was unskilled. (Tr. at 62-63, Finding Nos. 6-8). Considering these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including unskilled work as a laundry laborer or hospital cleaner at the medium exertional level or a price marker or housekeeping cleaner at the light exertional level. (Tr. at 63-64, Finding No. 9).

Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act. (Tr. at 64, Finding No. 10).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts four discernable challenges to the Commissioner's decision. First, she contends that the ALJ did not consider the severity of her thyroid impairments. (ECF No. 11 at 2). Second, Claimant argues that the ALJ did not properly weigh and explain her analysis of the evidence concerning her mental impairments, manipulative limitations, and low back pain with left lower extremity radiculopathy. (*Id.* at 2-3). Third, Claimant asserts that the ALJ did not present a hypothetical to the VE that included all of the limitations imposed by her back and left lower extremity pain, psychological impairments, and manipulative impairments. (*Id.* at 3-4). Fourth, Claimant contends that the ALJ did not consider her impairments in combination. (*Id.* at 4).

In response to Claimant's challenges, the Commissioner argues that the ALJ's evaluation of the consultative psychological opinion is supported by substantial evidence, and the hypothetical presented to the VE included all of Claimant's credibly established limitations. (ECF No. 12 at 10-14).

## V.    **Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court. The following evidence is most relevant to the issues in dispute.

### A. *Treatment Records*

On May 5, 2016, Claimant presented to her primary care provider, Megan Olish-Terry, PA-C, at Cabin Creek Health Center for follow up regarding hypertension and anxiety. (Tr. at 361). She requested that PA-C Olish-Terry increase her dosage of Zoloft

7

because she was having a hard time dealing with her mother's recent cancer diagnosis, and Claimant was also caring for her young granddaughter. (*Id.*). During her next appointment with PA-C Olish-Terry on June 17, 2016, Claimant reported that she was doing better on the increased dosage of Zoloft and Buspar. (Tr. at 355).

On August 1, 2016, Claimant complained to PA-C Olish-Terry that she was cutting grass on a hillside the previous day when her foot slipped over the side of the hill, and she twisted her left knee. (Tr. at 349). Claimant denied weakness, but she had knee pain that was worse when she was trying to go to sleep. (*Id.*). On examination, Claimant was limping, her left knee was tender to palpation, and she had discomfort with extension and flexion. (*Id.*). However, Claimant maintained full range of motion in her knee, had negative valgus/varus stress tests, appeared healthy, showed good judgment, and was active and alert. (*Id.*). PA-C Olish-Terry diagnosed Claimant with left knee strain. (Tr. at 350).

On August 30, 2016, Claimant told PA-C Olish-Terry that she was doing well overall. (Tr. at 346). The combination of Buspar and Zoloft were working well for her, although she was restless at night. (*Id.*). Claimant exhibited pain to palpation of her ankle and pain with internal and external rotation of her left foot, but her gait and station were normal. (*Id.*). PA-C Olish-Terry added Vistaril to Claimant's medication regimen to treat her difficulty sleeping. (Tr. at 347).

During follow up with PA-C Olish-Terry on October 20, 2016, Claimant complained of worsening knee pain. (Tr. at 493). She claimed that it was difficult to walk upstairs, and her knee was "giving out," swelling at night, and making a popping sound. (*Id.*). On examination, Claimant exhibited tenderness, pain without laxity, and difficulty arising from chair, but she had no edema and normal gait and station. (*Id.*). PA-C Olish-

8

Terry ordered an MRI of Claimant's knee. (Tr. at 494).

Claimant returned to PA-C Olish-Terry on November 1, 2016, to have a "disability form completed." (Tr. at 490). She stated that she could not work due to anxiety and reported a long history of depression and anxiety, including that she sometimes had to pull off of the road because she was so anxious, felt easily overwhelmed, and was stressed and panicked if given multiple tasks. (*Id*.). On examination, Claimant was anxious, sad, and tearful, but she was cooperative, made eye contact, and demonstrated intact thought processes. (*Id*.). PA-C Olish-Terry listed that Claimant got along with other individuals, and she had custody of her five-year-old granddaughter. (*Id*.). She renewed Claimant's prescriptions for Zoloft, Vistaril, and Buspar and referred Claimant to a psychologist. (Tr. at 491).

Claimant's left knee MRI, which was performed on November 23, 2016, indicated an osteochondral defect with adjacent small cyst and systemic anemia, high grade chondromalacia, cartilaginous loss, and joint effusion. (Tr. at 401). Claimant continued to complain of knee pain when she presented to a new primary care provider, Ashley Portz, PA-C, at Cabin Creek Health Center on April 7, 2017. (Tr. at 483). Claimant explained that she had not yet seen an orthopedist because she had to cancel her appointment in December. (Tr. at 483). Claimant's mood was good on Zoloft, Vistaril, and Buspar. (*Id*.). She reported having episodes of bilateral hand numbness, which was more noticeable when she was driving. (*Id*.). On examination, Claimant's grip strength was decreased, and she had positive Phalen's test. (Tr. at 483). Otherwise, Claimant had normal gait, motor strength and tone, and movement of her extremities; no edema; and intact sensation. (Tr. at 484). She denied dizziness or fatigue. (*Id*.). PA-C Portz referred Claimant for an EMG, which was performed on April 27, 2017. (Tr. at 423, 485). The

EMG indicated that Claimant had severe carpal tunnel syndrome on the right without ulnar entrapment and moderate carpal tunnel syndrome on the left. (Tr. at 423).

Claimant followed up with PA-C Portz on June 7, 2017. She stated that she continued to have bilateral hand numbness, but she had not tried wrist splints and was not ready for surgery because she did not have pain all of the time. (Tr. at 480). Claimant reported that her mood was still good on medications. (*Id.*). On examination, Claimant did not have masses or tenderness in her neck, cervical lymphadenopathy, or thyroid enlargement; she demonstrated good judgment and was oriented in all spheres; and her mood, affect, memory, muscle tone, movement of all extremities, gait, and sensation were all normal. (Tr. at 480-81). PA-C Portz prescribed a trial of Neurontin for Claimant's carpal tunnel syndrome, renewed Claimant's prescriptions for her "well controlled" anxiety, and again referred Claimant to an orthopedist for left knee pain. (*Id.*).

On November 15, 2017, Claimant presented to endocrinologist Raghda Sahloul, M.D., regarding her multinodular goiter, Hashimoto's thyroiditis, and hypothyroidism. (Tr. at 542). Claimant complained about taking Synthroid daily, but she stated that she lost 11 pounds and felt much better. (*Id.*). On examination, Claimant's thyroid was enlarged two to three times its normal size, but Claimant was pleasant, alert, oriented, and in no acute distress. (Tr. at 543). She had normal deep tendon reflexes and motor strength in her extremities. (*Id.*). Dr. Sahloul renewed Claimant's prescription for Synthroid and ordered a blood test and ultrasound. (*Id.*).

Claimant advised PA-C Portz on December 7, 2017, that her mood was still good on Buspar, Zoloft, and Vistaril, although she sometimes felt that her nerves were "shot" because she was taking care of her mother-in-law, which was a difficult task. (Tr. at 473).

Claimant still complained of knee pain and episodes of hand numbness, but she had not yet seen an orthopedist and declined carpal tunnel release surgery because she did "not have pain all the time." (Tr. at 472-73). Claimant demonstrated good judgment and was oriented in all spheres with normal mood, affect, memory, muscle tone, movement of all extremities, gait, and sensation. (Tr. at 473).

On March 29, 2018, Claimant complained of left knee and hip pain. (Tr. at 469). However, PA-C Portz did not find any abnormalities in Claimant's musculoskeletal or neurological examinations. Claimant had normal muscle tone and movement of extremities; no cyanosis or edema; normal gait; and intact sensation. (Tr. at 469-70). PA-C Portz ordered x-rays of Claimant's left hip and knee. (Tr. at 470). Claimant's left hip x-ray, which was taken on April 27, 2018, was normal, and her left knee x-ray taken on the same date reflected the same abnormalities noted in her 2016 MRI. (Tr. at 494).

Dr. Sahloul noted on May 16, 2018, that Claimant was pleasant, alert, oriented, and in no acute distress with normal deep tendon reflexes and motor strength in her extremities. (Tr. at 538). Her ultrasound showed that her thyroid conditions were stable. (Tr. at 540). Dr. Sahloul renewed Claimant's prescription for Synthroid. (Tr. at 538). Claimant continued to complain of carpal tunnel symptoms to PA-C Portz on June 29, 2018, but she stated that Neurontin helped. (Tr. at 465). She reported that her mood was stable. (*Id.*). Claimant was active and alert, oriented in all spheres, and she exhibited normal muscle tone, movement of extremities, gait, mood, affect, and recent and remote memory; no cyanosis or edema; and intact sensation. (Tr. at 466).

Claimant had an initial physical therapy evaluation on July 6, 2018, regarding her left hip pain and lumbar radiculopathy. (Tr. at 438). Claimant told PA-C Portz on October 19, 2018, that physical therapy was going well until she was not able to go

because of car issues. (Tr. at 462). Claimant's complaints, examination findings, and treatment plan were generally the same, except that Claimant stated that her knee pain was worsening, and she wanted a referral to an orthopedic specialist. (Tr. at 462-63). Claimant was discharged from physical therapy on November 5, 2018, because she failed to appear for her final six appointments. (Tr. at 440-41). When she followed up with Dr. Sahloul later that month, on November 19, 2018, Claimant again complained about taking Synthroid, but felt "ok" with no complaints. (Tr. at 534). Dr. Sahloul documented that Claimant was pleasant, alert, oriented, and in no acute distress with normal deep tendon reflexes and motor strength in her extremities. (Tr. at 535). He renewed her prescription for Synthroid. (*Id.*).

### B. Evaluations and Opinions

On August 2, 2016, state agency psychologist Timothy Saar, Ph.D., provided a mental assessment based upon his review of Claimant's records. In the paragraph B criteria, Dr. Saar found that Claimant had no limitations other than a mild limitation in social functioning. (Tr. at 119). He found that Claimant did not have any severe mental impairments. (Tr. at 120). Jeff Boggess, Ph.D., affirmed Dr. Saar's assessment on December 8, 2016. (Tr. at 127). On August 4, 2016, state agency physician Uma Reddy, M.D., assessed, based upon her review of Claimant's records, that Claimant did not have any severe physical impairments or RFC limitations. (Tr. at 121). Palle Reddy, M.D., affirmed Dr. Reddy's findings on December 9, 2016. (Tr. at 129).

Brandy Vannatter, D.O., performed a consultative examination of Claimant, and she completed an RFC form on March 30, 2018. Dr. Vannatter opined that Claimant could perform work at the sedentary exertional level with a limited ability to push and pull with her extremities. (Tr. at 403). In support, Dr. Vannatter stated that the evidence

was consistent with carpal tunnel syndrome, extensive chondromalacia of the left knee, and significant cartilaginous loss per Claimant's MRI and physical examination. (*Id.*). Dr. Vannatter assessed that Claimant could occasionally climb ramps/stairs, but never perform other postural activities, such as climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch, or crawl due to her left knee impairment. (Tr. at 404). Further, Dr. Vannatter opined that Claimant was limited to occasionally reaching in all directions, handling, and fingering based on her carpal tunnel syndrome, which Dr. Vannatter explained was reflected in Claimant's physical examination and her score of less than five percent of the National Average on the Purdue Pegboard Test. (Tr. at 405); *see* (Tr. at 410). Finally, Dr. Vannatter concluded that Claimant should avoid concentrated exposure to wetness, humidity, and fumes; moderate exposure to temperature extremes; and all exposure to vibration and hazards. (Tr. at 406). Dr. Vannatter stated that the environmental limitations were assessed based on the risk of injury to Claimant due to her carpal tunnel syndrome and left knee impairment. (*Id.*).

On August 6, 2018, psychologist Kara Gettman-Hughes, M.A., performed a consultative mental status examination of Claimant. Claimant reported that she did not have any history of mental health treatment other than her family physician prescribing her medications. (Tr. at 415). She was cooperative and oriented in all spheres with fair eye contact. (Tr. at 416). Claimant's speech was loquacious but responsive and coherent, and she displayed labile affect, circumstantial thought processes, no abnormal thought content, normal psychomotor behavior, severely impaired immediate memory based on the word recall test, moderately impaired recent memory based on the Cognistat Memory test, fair to poor remote memory based on her ability to recall details of her personal history, severely impaired concentration based on her Digit Span score,

moderately impaired persistence based on her ability to remain on task during the examination, variable pace during the evaluation, and moderately impaired social functioning based on her interaction with examiner. Ms. Gettman-Hughes diagnosed Claimant with generalized anxiety disorder, panic disorder, major depressive disorder, and somatic pain disorder. (Tr. at 416-17).

On the same date, Ms. Gettman-Hughes completed a medical source statement concerning Claimant's ability to do mental work-related activities. Ms. Gettman-Hughes assessed that Claimant's ability to understand, remember, and carry out simple instructions; make judgments on simple work-related decisions; and interact appropriately with the public, supervisors, and co-workers was moderately limited. (Tr. at 419-20). She further found that Claimant's ability to understand, remember, and carry out complex instructions; make judgments on complex work-related decisions; and respond appropriately to usual work situations and to changes in a routine work setting was markedly limited. (*Id.*).

### C. Claimant's Statements

Claimant completed an adult function report on July 2, 2016. She wrote that she took care of her granddaughter since 2011, including cooking for her, bathing her, watching her play, taking her to the doctor and dentist, and teaching her about the alphabet and numbers. (Tr. at 282). Claimant also cared for pets, including cats and a bunny. (*Id.*). She had "no problem" performing all personal care activities. (*Id.*). Claimant washed dishes, did laundry, and mowed the lawn, but she sometimes forgot the laundry in the washing machine and let the dishes pile up for a few days before washing them, and mowing made her tired. (Tr. at 283). Claimant stated that she drove, but she did not like going out alone. (Tr. at 284). She could pay bills, count change, and

handle a savings account, but she had difficulty using a checkbook. (*Id.*). Her hobbies included fishing, hunting, and riding bikes, but she did not pursue her hobbies very often. (Tr. at 285). Claimant visited her daughter every two weeks and went to the store two times per month. (*Id.*). She stated that she could pay attention for 15 to 20 minutes, followed directions "okay," and did not handle stress or changes in routine very well. (Tr. at 286-87).

Claimant later testified during her administrative hearing on December 6, 2018, that she could not cook or do chores because her hands would "go numb," and her daughter did her chores for the past 10 years or more. (Tr. at 83-84). Claimant reported that she had issues with her concentration and memory since her teenage years. (Tr. at 80, 85). She claimed that she could not remember things that someone told her even five minutes earlier, and she did not watch television often and could not follow the programs. (Tr. at 85, 86). Claimant testified that she slept approximately four hours per night due to pain in her hands, elbows, and shoulders, and she did not drive due to numbness in her hands and anxiety. (Tr. at 92, 96). Claimant stated that depression caused her to be nervous and "down," and her depression medication caused her to be drowsy and dizzy. (Tr. at 91). Claimant testified that she was also recently diagnosed with severe carpal tunnel syndrome, but the symptoms of numbness and tingling in her hands and pain with reaching bothered her for the past 10 to 15 years. (Tr. at 83, 86, 87). She also had a goiter since she was 12, but it worsened in the past five or six years, and she was tired all of the time due to thyroid issues, yet she was restless and could not sleep. (Tr. at 86, 87).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is

based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to ensuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

Claimant challenges the ALJ's analysis of her non-severe thyroid impairments, assessment of her RFC, hypotheticals posed to the VE, and consideration of her impairments in combination. Each argument is discussed below, in turn.

### A. Thyroid Impairments

Claimant asserts that the ALJ did not properly consider the severity of her thyroid conditions. (ECF No. 11 at 2). At the second step of the sequential evaluation process, the ALJ concludes whether the claimant has an impairment or combination of

impairments that is severe. 20 C.F.R. § 416.920(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. § 416.922(a); SSR 96-3p, 1996 WL 374181, at *1. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28, 1985 WL 56856).

Basic work activities are the "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.922(b). Examples include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) using judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. *Id.*

Importantly, the claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003). The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment. Moreover, to qualify as a severe impairment under step two, the impairment must have lasted, or be expected to last, for a continuous period of at least twelve months and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of not disabled is made at step two, and the

sequential process comes to an end. On the other hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54 (1987)); *see also Felton–Miller v. Astrue,* 459 F. App'x 226, 230 (4th Cir. 2011) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement.").

In this case, the ALJ found that Claimant's hypothyroidism and goiter were non-severe impairments. (Tr. at 55). The ALJ cited that the conditions were effectively treated with medication and routine follow up appointments. (*Id.*). The ALJ further explained that Claimant's thyroid ultrasound in May 2018 showed stable findings, and Claimant's endocrinologist merely prescribed Synthroid and recommended six month follow up. (*Id.*). The ALJ discussed that, even as late as November 2018, Claimant denied any complaints related to her thyroid condition. (*Id.*). Therefore, the ALJ concluded that Claimant's thyroid conditions were non-severe. (*Id.*).

In support of her argument that the conditions were more severe than the ALJ assessed, Claimant cites her diagnoses of goiter, hypothyroidism, and Hashimoto's thyroiditis and her testimony that she felt "tired all the time." (ECF No. 11 at 2). She further asserts that Ms. Gettman-Hughes's consultative mental examination findings supported that she had a slow pace, which was consistent with her poor performance on the Purdue Pegboard Test administered by Dr. Vannatter. (*Id.*). However, Claimant does not identify any evidence that undermines the ALJ's analysis, and the step two finding is supported by substantial evidence for the following reasons.

Claimant's providers did not document complaints, symptoms, or limitations

related to Claimant's thyroid conditions. Rather, Claimant's primary care providers repeatedly described Claimant as "active and alert." (Tr. at 349, 462, 466, 473, 480). Claimant's endocrinologist likewise consistently noted that Claimant was alert, and he prescribed Synthroid and scheduled six-month follow up appointments. (Tr. at 535, 538, 543). In addition, Claimant denied fatigue in April 2017, her ultrasound in May 2018 showed that her thyroid conditions were stable, and Claimant denied any thyroid-related complaints in November 2018. (Tr. at 484, 535, 540).

The ALJ's analysis of Claimant's reported activities further reinforced her assessment that Claimant's thyroid conditions were non-severe. The ALJ cited that Claimant cared for her granddaughter since 2011, cared for cats and a bunny, washed dishes, mowed the grass, and watched her mother-in-law who had dementia. (Tr. at 62); *see* (Tr. at 282, 283, 349, 361, 473, 490).

Regarding the consultative examinations, neither expert discussed Claimant's thyroid symptoms, expressed that Claimant had limitations associated with her thyroid conditions, or established any correlation between the consultative examination findings and Claimant's thyroid conditions. Ms. Gettman-Hughes noted that Claimant's pace was variable during the psychological examination. (Tr. at 416). However, she was tasked with evaluating Claimant's mental limitations and did not attribute any limitations to Claimant's thyroid conditions. (Tr. at 415-17, 419-20). Furthermore, Dr. Vannatter administered the Purdue Pegboard Test to evaluate Claimant's dexterity. (Tr. at 410). Dr. Vannatter did not mention or assess any limitations related to Claimant's fatigue or thyroid conditions. (Tr. at 403-06).

For the above reasons, the undersigned **FINDS** that the ALJ properly considered the evidence of Claimant's thyroid impairments, and the ALJ's conclusion that the

impairments did not have more than a minimal effect on Claimant's ability to do basic work activities is supported by substantial evidence.

### B. RFC Analysis

Claimant next challenges the ALJ's RFC analysis regarding her manipulative, psychological, and low back and lower extremity impairments. SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the **most** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id*. According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id*. at *3.

The functions which the ALJ must assess include a claimant's physical abilities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); mental abilities, such as understanding, remembering, and carrying out instructions and responding appropriately to supervision, coworkers, and work pressures in a work setting; and other abilities, such as seeing and hearing. 20 CFR § 416.945(b)-(d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed;

(2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

Claimant contends that the ALJ did not properly consider her testimony, the objective findings, or the medical opinions in the RFC assessment. Under the applicable Social Security ruling and regulation, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. § 416.929 (effective March 27, 2017). First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including

pain. *Id*. § 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id*. § 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects

received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. § 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable evidence to consider may include (1) a longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other impairments, such as potential mental impairments, that could account for an individual's allegations. *Id.*

In *Hines v. Barnhart*, the Fourth Circuit stated that:

Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors

23

described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for that of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Regarding opinion evidence, Claimant protectively filed for benefits in June 2016. Thus, the regulation which applies to applications filed before March 27, 2017, governs this matter. Under the applicable law, the ALJ was required to consider the

24

medical opinions in the case record together with the rest of the relevant evidence that the ALJ received. 20 C.F.R. § 416.927(b). Medical opinions were defined as statements from physicians and psychologists or other acceptable medical sources that reflected judgments about the nature and severity of a claimant's impairment(s), including the claimant's symptoms, diagnosis and prognosis, what the claimant could still do despite the impairment(s), and the claimant's physical or mental restrictions." *Id.* § 416.927(a)(1).

The regulation outlined how the opinions of accepted medical sources would be weighed in determining whether a claimant qualified for disability benefits. Unless an ALJ gave controlling weight to the medical opinion of a treating source, the ALJ was required to consider the following factors in deciding the weight to give to any medical opinion: (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion (hereinafter collectively "the regulatory factors"). *Id.* § 416.927(c).

Medical source statements on issues reserved to the Commissioner were treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulation and SSR 96-5p, the SSA explained that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;

4. How the vocational factors of age, education, and work experience apply; and

5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner was never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, the ALJ was required to carefully consider those opinions and assess the supportability and consistency of the opinions with the record as a whole. *Id.* at *3.

### 1. Manipulative Limitations

Claimant argues that the ALJ failed to give "proper weight" to her testimony, EMG study, Purdue Pegboard Test, and Dr. Vannatter's RFC opinion regarding her manipulative impairments. (ECF No. 11 at 2-3). Claimant contends that the ALJ's assessment that she could frequently reach, handle, and finger was not supported by substantial evidence. (*Id.* at 2).

In this case, the ALJ noted Claimant's complaints of hand numbness and cited Claimant's testimony that she wore wrist splints. (Tr. at 58). The ALJ found that Claimant's medically determinable impairment could reasonably be expected to cause her alleged symptoms, but Claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. at 58-59). The ALJ considered Dr.

Vannatter's opinion that Claimant could only occasionally reach, finger, and feel. (Tr. at 59). However, the ALJ gave the opinion little weight because she found that it was inconsistent with the "objective findings on clinical testing and physical examinations, as well as the claimant's self-reported activities of daily living." (*Id.*). The ALJ cited Claimant's EMG in April 2017, which showed severe carpal tunnel syndrome on the right without ulnar entrapment and moderate carpal tunnel syndrome on the left. (Tr. at 60). The ALJ next noted that Claimant stated in June 2017 that she was not ready for surgery because she did not have pain all of the time, and she was prescribed Neurontin. (*Id.*). The ALJ cited that, during follow up in October 2018, Claimant's sensation was grossly intact, and she reported that Neurontin helped her carpal tunnel symptoms. (*Id.*). The ALJ listed Claimant's activities of daily living, which included caring for her granddaughter and pets, washing dishes, mowing, and using the computer. (Tr. at 62). Finally, the ALJ also considered the state agency physicians' opinions that Claimant did not have any severe physical impairments or limitations, but the ALJ gave the opinions little weight due to Claimant's EMG. (Tr. at 62). The ALJ concluded, based on the above evidence, that Claimant could frequently reach, handle, and finger with both extremities. (Tr. at 58, 60, 62).

While much of the above analysis is well supported, the ALJ failed to properly explain and reconcile conflicting evidence concerning Claimant's manipulative impairments. Specifically, the ALJ stated that Dr. Vannatter's opinion that Claimant could occasionally reach, handle, and finger was "inconsistent with Claimant's clinical tests." (Tr. at 59). However, the only clinical test that the ALJ mentioned regarding Claimant's manipulative impairments was Claimant's EMG, which showed severe carpal tunnel syndrome on the right and moderate carpal tunnel syndrome on the left. (Tr. at

55, 60). The ALJ did not explain how the EMG findings of severe and moderate impairments were inconsistent with Dr. Vannatter's opinion that Claimant could only perform occasional manipulative activities and supported the ALJ's assessment that Claimant could perform those activities frequently. Furthermore, the ALJ entirely neglected to consider the Purdue Pegboard Test administered by Dr. Vannatter in which Claimant scored less than five percent of the national average. (Tr. at 410). Although Dr. Vannatter explicitly relied on those test results, in addition to Claimant's physical examination, in support of her assessment of Claimant's manipulative abilities, (Tr. at 405), the ALJ did not consider that objective test.

Given that the two clinical tests in the record documented significant manipulative impairments, it is unclear why the ALJ concluded that Dr. Vannatter's opinion was entitled to little weight on the basis of the clinical tests, and why the ALJ cited the EMG as a basis for her RFC assessment that Claimant could perform frequent manipulative activities. The ALJ's lack of explanation precludes meaningful review of the decision. Furthermore, the error cannot be considered harmless because all of the jobs which the ALJ relied upon at step five require frequent reaching and handling, as defined by the Dictionary of Occupational Titles. (Tr. at 63); DOT 361.685-018 (laundry worker II), 1991 WL 672987; DOT 323.687-010 (cleaner, hospital), 1991 WL 672782; DOT 323.687-014 (cleaner, housekeeping), 1991 WL 672783; DOT 209.587-034 (marker), 1991 WL 671802. In fact, the VE testified that a person with Claimant's characteristics and RFC could not perform any jobs if the person was limited to occasional, rather than frequent, manipulative activities. (Tr. at 110). Therefore, the ALJ assessment of Claimant's manipulative abilities directly impacted her step five determination and conclusion that Claimant was not disabled.

For those reasons, the undersigned **FINDS** that the ALJ's RFC analysis of Claimant's manipulative impairments is not supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be **REMANDED** so that the ALJ may reexamine or elaborate upon her analysis and RFC finding concerning Claimant's manipulative impairments.

### 2. Mental Impairments

Claimant also asserts that the ALJ did not properly evaluate the evidence concerning her mental impairments. (ECF No. 11 at 3, 4). The ALJ noted that the state agency psychologists found that Claimant had no limitation in performing activities of daily living or maintaining concentration, persistence, or pace; mild limitation in social functioning; and no repeated episodes of decompensation. (Tr. at 56). However, the ALJ gave those findings little weight, as the criteria for evaluating mental health conditions changed after the state agency psychologists reviewed the record. (*Id.*). Further, the ALJ determined that the evidence, particularly the consultative examination, supported that Claimant was more psychologically limited than the experts assessed. (*Id.*).

In the functional area of understanding, remembering, or applying information, the ALJ found that Claimant was moderately limited. She considered Ms. Gettman-Hughes's finding that Claimant had difficulty instantly recalling four out of four words and her assessment that Claimant had moderately impaired recent memory and fair to poor remote memory. (Tr. at 57). The ALJ explained that, notwithstanding the consultative psychologist's findings, Claimant's primary care records consistently reflected that Claimant had normal recent and remote memory. (*Id.*). Thus, the ALJ found that Claimant had no more than moderate limitation. (*Id.*).

The ALJ concluded that Claimant was also moderately limited in interacting with others, noting that Ms. Gettman-Hughes indicated that Claimant was moderately impaired in that functional area during the consultative examination, although Claimant was cooperative and maintained fair eye contact. (*Id.*). In addition, Claimant reported playing with her granddaughter daily, going to the store twice per month, and getting along "okay" with authority figures. (*Id.*).

The ALJ found that Claimant was likewise moderately limited in the functional area of maintaining concentration, persistence, or pace. (*Id.*). The ALJ noted that Ms. Gettman-Hughes assessed that Claimant's ability to concentrate was severely impaired, but it was based only on Claimant's Digit Span score. (*Id.*). In addition, the ALJ cited that Ms. Gettman-Hughes assessed only moderate impairment in persistence and variable pace. (*Id.*). Furthermore, the ALJ considered that Claimant's primary care records documented that Claimant was active, alert, and full oriented, and she stated that she was "okay" at following instructions. (*Id.*).

Finally, the ALJ concluded that Claimant did not have any limitation adapting or managing herself. (*Id.*). She cited that Ms. Gettman-Hughes assessed that Claimant had fair insight and only mildly impaired judgment without evidence of delusions or paranoia, Claimant's primary care records documented her normal mood and affect and good judgment, and Claimant reported having no problem with personal care or preparing her own meals. (*Id.*).

In the RFC analysis, the ALJ considered Claimant's allegations that she had panic attacks two or three times per day, as well as memory problems. (Tr. at 58). The ALJ noted that Claimant further alleged that she felt dizzy, which she believed to be a side effect of her medication, and she did not drive, in part, due to anxiety. (*Id.*). The ALJ

concluded that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. The ALJ considered Ms. Gettman-Hughes's assessment that Claimant's memory and ability to concentrate were impaired based on her scores during a battery of tests that Ms. Gettman-Hughes administered during the consultative examination. (Tr. at 61). The ALJ also considered Ms. Gettman-Hughes's opinions regarding Claimant's ability to perform mental work-related functions. (*Id*.). However, the ALJ only gave Ms. Gettman-Hughes's opinion some weight. (*Id*.). The ALJ discussed that Claimant had a high level of functioning, including caring for her granddaughter since 2011 and obtaining custody of her in 2016. (Tr. at 60-62). In addition, the ALJ noted that Claimant was treated conservatively with medication from her primary care provider and did not require any specialized psychological treatment. (*Id*.). Furthermore, the ALJ discussed that Claimant's treatment was effective, and Claimant reported that her medications were working well, and she displayed good mood and judgment, was active alert, and her recent and remote memory were normal during examinations. (*Id*.). Ultimately, after considering all of the evidence, the ALJ concluded that Claimant could understand, remember, and carry out simple routine tasks involving only simple work related decisions with the ability to adapt to routine workplace changes, and she could have no interaction with the general public, occasional interaction with co-workers and supervisors, and no strict production quotas. (Tr. at 58).

While the ALJ thoroughly discussed the evidence, she did not connect it to her RFC findings. Furthermore, the evidence which she cited does not reconcile with the

RFC conclusions in order for the Court to ascertain the ALJ's reasoning. For instance, the ALJ concluded that Claimant's ability to interact with others was only moderately limited, and she cited evidence disputing that Claimant was more severely impaired. (Tr. at 57). Yet, the ALJ assessed the strict RFC limitation that Claimant could have no contact with the general public. (Tr. at 58). While that RFC restriction may be appropriate, the Court cannot evaluate whether it is supported by substantial evidence without knowing the basis for it.

The ALJ made the same error concerning the rest of the mental RFC restrictions. She did not build a logical bridge from the evidence that she cited to her assessment that Claimant was limited to simple tasks and decision, occasional interaction with co-workers and supervisors, and no strict production quotas. The ALJ discussed that the Claimant was cooperative; her anxiety was well controlled with conservative treatment of medication from her primary care provider; and her level of functioning, including caring for her granddaughter, belied her allegations regarding the severity of her mental impairments. (Tr. at 60-62). Therefore, given the fact that the ALJ cited evidence indicating that Claimant did not have severe mental restrictions, it is unclear why the ALJ assessed mental limitations in Claimant's RFC. The ALJ assessed very specific mental RFC restrictions, and she was obligated to explain the basis for them.

Furthermore, the ALJ concluded, without explanation, that Claimant could adapt to routine workplace changes. (Tr. at 58). This was a critical finding in light of the fact that Ms. Gettman-Hughes assessed a marked limitation in that area, and the VE testified that a marked limitation in adapting to routine workplace changes would eliminate all jobs. (Tr. at 112). Yet, despite the clear vocational impact, the ALJ failed to explain her basis for explicitly assessing that Claimant had no limitation adapting to routine

32

workplace changes. (*Id.*).

A "proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion. The second component, the ALJ's logical explanation, is just as important as the other two." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019), *as amended* (Feb. 22, 2019). As the Fourth Circuit stated, "our precedent makes clear that meaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion." *Id.*

For those reasons, the undersigned **FINDS** that on remand the ALJ should reexamine or elaborate upon her analysis and RFC finding regarding Claimant's mental impairments.

### 3. Back and Lower Extremity Impairments

Claimant also argues that the ALJ did not properly consider her complaints of low back pain and numbness and left leg radiculopathy, other than to determine whether or not Claimant could ambulate. (ECF No. 11 at 3). The ALJ cited Claimant's pain complaints, the objective findings, Claimant's clinical treatment, and the opinion evidence. (Tr. at 59-62). The ALJ discussed that Claimant did not have any physical complaints on May 5, 2016, just prior to filing her SSI application, but she strained her left knee while mowing grass on a hillside on August 1, 2016. (Tr. at 59). The ALJ considered the results of Claimant's left knee MRI on November 23, 2016; x-ray on March 29, 2018; Dr. Vannatter's March 30, 2018, opinion; and the RFC opinions of the state agency physicians, who concluded that Claimant did not have any physical limitations. (Tr. at 59, 60, 62). The ALJ gave Dr. Vannatter's opinion little weight because it was inconsistent with the objective findings on clinical testing and physical examination, as well as Claimant's reported activities of daily living. (Tr. at 59). The ALJ

stated that Claimant consistently had normal gait, which was not supportive of Dr. Vannatter's assessment that Claimant could stand and/or walk less than two hours in a workday. (*Id.*). The ALJ cited that Claimant was treated conservatively with medication and physical therapy, noting that Claimant acknowledged not doing her home exercises a lot, and she stopped attending physical therapy. (Tr. at 60). However, the ALJ explained that, despite not completing physical therapy, Claimant had normal gait and station through October 19, 2018, as well as normal movement of extremities, intact sensation, and no edema. (*Id.*).

The ALJ gave little weight to the state agency physicians' opinions that Claimant did not have any physical limitations because of the objective findings in Claimant's left knee MRI and the fact that she underwent physical therapy for lumbar radiculopathy. (Tr. at 62). Ultimately, the ALJ concluded that Claimant could perform medium work, except that she could never climb ladders, ropes, or scaffolds and frequently balance, stoop, kneel, crouch, and crawl. (Tr. at 58).

As shown above, the only exertional or postural activity that the ALJ directly addressed was Claimant's ability to stand and walk. The ALJ cited evidence concerning Claimant's obesity, knee impairment, and lumbar radiculopathy, but she did not connect any of that evidence to her RFC findings that Claimant could perform medium work with frequent postural activities, except for never climbing ladders, ropes, or scaffolds. (Tr. at 58-60). The ALJ did not explain the RFC limitations on a function-by-function basis, and it is not clear from the decision which impairments or symptoms related to the specific restrictions. In the RFC analysis, the ALJ generally focused on explaining why she concluded that Claimant was not as limited as Claimant alleged, but the ALJ did not articulate the basis for the RFC limitations that she assessed. Moreover, the ALJ did not

explain how Dr. Vannatter's opinion was inconsistent with the evidence other than to state that that Dr. Vannatter's standing and walking limitation was inconsistent with the evidence of Claimant's normal gait. (Tr. at 59). The ALJ did not discuss her reasons for giving little weight to Dr. Vannatter's opinions concerning Claimant's other functional abilities.

For those reasons, the undersigned **FINDS** that on remand the ALJ should reexamine or elaborate upon her analysis and RFC finding regarding Claimant's exertional and postural abilities.

### C. VE Hypothetical

Claimant argues that the ALJ did not address her pain or mental limitations in the hypothetical that she posed to the VE, and the ALJ erred in not accepting the VE's testimony that there would no jobs for an individual with Claimant's characteristics and RFC who could occasionally reach, handle, and finger. (ECF No. 11 at 4).

In order for a VE's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into an RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v.*

*Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

In this case, the ALJ asked the VE whether someone with Claimant's characteristics and RFC could perform any jobs. (Tr. at 108-09). The VE answered affirmatively and provided a list of jobs that the person could perform. (Tr. at 109-10). The ALJ presented a second hypothetical in which she changed the manipulative restriction to occasional handling, fingering, and feeling, and the VE responded that it would eliminate all jobs. (Tr. at 110). The ALJ then asked in her third and fourth hypotheticals if the person with Claimant's characteristics and RFC could work if the person was off task more than 15 percent of the workday or absent from work two or more days per month. (Tr. at 110-11). The VE responded that either limitation would eliminate all jobs. (*Id.*). Finally, Claimant's attorney asked the VE if there were any jobs available to someone with the limitations assessed by Ms. Gettman-Hughes. (Tr. at 111-12). The VE answered that the mental limitations would eliminate all jobs, primarily because of the marked limitation in responding to usual work situations and changes. (Tr. at 112).

As discussed, the ALJ's RFC assessment was unsupported by substantial evidence because the ALJ failed to address conflicting evidence and explain her reasoning for the limitations that she assessed. Therefore, the ALJ's hypothetical to the VE was likewise

flawed because it was not based on an RFC that was supported by substantial evidence. Accordingly, the undersigned **FINDS** that the ALJ did not properly rely on the VE's testimony at steps four and five of the sequential evaluation. On remand, the ALJ should explain the basis for the RFC limitations that she assessed based on the relevant evidence in the record, and, to the extent that the RFC finding changes, the ALJ should pose a new hypothetical to the VE.

### D. Combination of Impairments

Claimant asserts that the ALJ failed to consider all of her impairments, including her pain, in combination pursuant to 20 C.F.R. § 416.923. (ECF No. 11 at 4). An ALJ must consider the combined, synergistic effect of all of a claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on the claimant. *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989). The relevant regulation provides:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 416.923. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect that the various impairments have on claimant's ability

to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). As the United States Court of Appeals for the Fourth Circuit stated in *Walker,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." *Walker,* 889 F.2d at 50.

The undersigned recommended that the matter be remanded for reconsideration or elaboration of the ALJ's incomplete RFC analysis. Therefore, the undersigned cannot conclude that the ALJ properly considered the combined or total effect of Claimant's impairments when the ALJ did not adequately consider or explain her analysis of the individual parts. The undersigned **FINDS** that on remand the ALJ must consider vocational impact of Claimant's impairment in combination.

## VIII.  **Recommendations for Disposition**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF No. 11), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 12); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code,

Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** July 9, 2021

Cheryl A. Eifert
United States Magistrate Judge

39